IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
DEC - 5 2008
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| MICROSOFT CORP., <br> Plaintiff, <br><br> v. <br><br> PRONET CYBER TECHNOLOGIES, <br> INC., et al., <br> Defendants. | ) <br> ) <br> ) <br> )    No. 1:08cv434 <br> ) <br> ) <br> ) <br> ) |

## ORDER

The matter came before the Court for a hearing on plaintiff's motion for partial summary judgment, pursuant to Rule 56, Fed. R. Civ. P., as to defendants' liability on all six claims of plaintiff's first amended complaint. Specifically, plaintiff sought summary judgment as to liability against all defendants on its claims of (i) copyright infringement, in violation of 17 U.S.C. §§ 106(3) and 501(a) ("Claim I"); (ii) infringement by distribution of illegally-imported copyrighted works, in violation of 17 U.S.C. §§ 106, 501, and 602(a) ("Claim II"); (iii) illegal trafficking in counterfeit and unauthorized "Product Keys," in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.* ("DMCA") ("Claim III"); (iv) illegal trafficking in counterfeit or unauthorized Product Keys, counterfeit Product Key labels, and counterfeit certificates of authenticity ("COAs"), all in violation of the Anti-Counterfeiting Amendments Act of 2004, 18 U.S.C. § 2318 ("ACAA") ("Claim IV"); (v) trademark infringement, in violation of 15 U.S.C. § 1114(1) ("Claim V"); and (vi) false designation of origin, in violation of 15 U.S.C. § 1125(a)(1) ("Claim VI"). Defendant filed a timely response in opposition, and the parties appeared for oral argument on plaintiff's motion. In the end, plaintiff was granted partial summary judgment as to liability on Claims I, II, III, V, and VI, and

further briefing was ordered with respect to Claim IV. This Order reflects that ruling and elucidates the bases for it.

I[1]

Plaintiff Microsoft Corp. ("Microsoft"), a Washington corporation, develops, markets, distributes, and licenses computer software throughout the United States and abroad. Defendant Pronet Cyber Technologies, Inc. ("Pronet"), a Delaware corporation with its principal place of business in Alexandria, Virginia, distributes computer software and components on the internet through various websites and other means. Defendant Joseph Teshome ("Teshome"), a Virginia resident, is the sole owner, operator, and employee of Pronet. Pronet and Teshome have been in the business of selling and distributing Microsoft products since at least 1999, although Microsoft only brings its claims here on the basis of defendants' distribution of Microsoft products since May 2005.

Microsoft's software products, which are typically sold on CD-ROMs and other forms of computer media, are distributed along with a number of proprietary materials and security features. Those include, *inter alia*: (i) user guides and manuals; (ii) end user license agreements ("EULAs"), which define the scope of a user's license with respect to a particular product; (iii) Product Keys, which are 25-character alphanumeric codes, unique to each licensee to whom a product is distributed, that must be entered by a user in order for the Microsoft program to operate properly; and (iv) COAs, which are certificates or labeling components that contain difficult-to-reproduce security features and which help users identify genuine Microsoft products. Additionally, all licensed Microsoft products are distributed with materials that contain various trademarks registered to

---

[1] The facts recited here are derived from the record as a whole and are largely undisputed. Where disputes exist, they are noted and their materiality assessed.

Microsoft, including, *inter alia*: (i) "MICROSOFT," (ii) "WINDOWS," and (iii) Microsoft's well-known "colored-flag" design logo.

In many cases, a particular product's Product Key code is located on its unique COA label. By maintaining an internal list that matches each copy of a particular program to that copy's unique Product Key code, Microsoft is able to determine whether a given user has the appropriate license for the product in that user's possession. Nevertheless, even where a particular Product Key is not intended for use with a particular product, it may still permit a user to access the product in that user's possession. Thus, improperly-used Product Keys generally fall into two categories; (i) "unauthorized" Product Keys, where a user has obtained an otherwise valid Product Key not meant for that particular product; or (ii) "counterfeit" Product Keys, where a user has obtained a Product Key that was created by someone other than Microsoft but which nonetheless succeeds in permitting the user to install the program. In this respect, Microsoft's Product Key system is essentially equivalent to a building security system where specified users have identification cards that permit them to enter the building. Although an unauthorized user may come into possession of another's valid identification card—or, in some cases, perhaps even discover a means by which to produce counterfeit cards—the operator of the security system, through maintenance of its own internal list, can nevertheless determine whether that individual, once having gained access to the building, should have been able to do so.

The Microsoft software programs at issue in this suit, each of which is subject to a valid copyright held by Microsoft, are (i) Microsoft Windows 98, (ii) Microsoft Windows XP Professional, and (iii) Microsoft Windows 2003 Server. In addition to selling those programs to individual customers, Microsoft also maintains a number of unique means of distributing its

programs to particular types of customers. Those means include, *inter alia*: (i) Microsoft's "Student Media" program, which offers specially-licensed software at a reduced price to academic institutions in the United States and abroad; (ii) Microsoft's "Fresh Start for Donated Computers" program ("Fresh Start"), which distributes specially-licensed software free of charge to certain academic institutions to ensure that donated computers are running legitimate Microsoft products; and (iii) Microsoft's Volume Licensing program, which distributes specially-licensed software to companies and organizations that require broad-based use. Microsoft's Student Media, Fresh Start, and Volume Licensing programs all require unique license agreements. Those agreements often include special restrictions on the manner in which products may be used and distributed, including geographic restrictions. Moreover, many Microsoft products that are part of unique distribution programs are specifically labeled as "Not for Resale."

Neither Pronet, nor Teshome, is licensed or authorized to sell, distribute, import, or manufacture Microsoft products through the Student Media, Fresh Start, or Volume Licensing programs. Nevertheless, defendants sold a number of those programs' products through various websites between May 2005 and May 2008, including products marked or designated as "not for resale." Specifically, Microsoft investigators purchased multiple software products through defendants' website that Microsoft later determined were infringing, tampered with, distributed without appropriate licenses, and in some cases counterfeit. Those product sales included, *inter alia*:

(i)  the May 2005 sale of one unit of Windows 98 SE, intended for use in the Fresh Start program, but from which the CD artwork, part number, and text indicating its unique link to the Fresh Start program had been removed;

(ii) the December 2006 sale of ten units of Windows XP Professional x64 Student Media, licensed for exclusive distribution in Ireland and not the United States;

 (iii) the January 2007 sale of two units of Windows XP Professional x64 Student Media, licensed for exclusive distribution in Ireland and not the United States;

 (iv) the March 2007 sale of two units of Windows XP Professional x64 Volume License Media, licensed for exclusive distribution in Ireland and not the United States;

 (v) the February 20, 2008 sale of one unit of Windows XP Professional SP2, containing a counterfeit Product Key label and an unauthorized Product Key;

 (vi) the February 29, 2008 sale of three units of Windows XP Professional SP2, all of which contained counterfeit Product Key labels, two of which contained unauthorized Product Keys, and one of which contained an invalid Product Key; and

 (vii) the March 2008 sale of five units of Windows XP Professional x64 Volume License Media, licensed for exclusive distribution in Ireland and not the United States, and all containing counterfeit Product Keys on counterfeit product Key Labels.

Additionally, the record reflects that defendants received an order from Microsoft's investigators in April 2008 for Windows Server 2003, and the record further reflects that the unit sold to Microsoft's investigators contained a counterfeit COA label on which an unauthorized Product Key was printed. Although defendants argue that they did not fulfill the Windows Server 2003 order from their own supply, instead arranging for the order to be "drop-shipped" by a third party, defendants do not contest having arranged the order.

 Defendants aver that with respect to each counterfeit, infringing, or otherwise unlicensed product, defendants did not know that the products were unlicensed or that the Product Keys were unauthorized. Teshome did testify during his deposition, however, that he had, from time to time, placed Product Key labels that he had created onto CD-ROMs containing Microsoft products. Teshome testified that he did so when the original Product Key labels had been damaged, and that

he replaced the damaged labels with labels he created. Teshome testified that he received the Product Key codes for the labels he created from stand-alone sheets of Product Key labels. Although Microsoft alleged that these sheets of Product Key labels, because of the nature by which those labels are affixed to products, could not have been legally created or sold in such "stand-alone" form, Teshome testified that he received the sheets of Product Key labels, either as copies or originals, from his suppliers, and that he only used them as a means of trying to "match" products with damaged Product Key labels with their appropriate Product Keys. In any event, Teshome testified that he did, on at least some occasions, re-use Product Keys on more than one product without a valid license to do so..

In addition to obtaining products directly from defendants, Microsoft's investigators also sent defendants a number of letters warning them about potentially-infringing activity. Specifically, Microsoft sent the following to defendants:

(i) three letters in September 1999, May 2000, and April 2002, that warned defendants regarding unlicensed and counterfeit sales that are not at issue in this suit;

(ii) a January 2005 letter notifying plaintiff that a newly-passed law, the ACAA, made it unlawful to knowingly traffic in illicit COA labels, including stand-alone labels;

(iii) a June 2005 warning letter regarding defendants' unlicensed sale of Fresh Start programs;

(iv) a January 3, 2007 warning letter regarding defendants' unlicensed sale of Student Media programs;

(v) a January 30, 2007 warning letter regarding defendants' unauthorized distribution of Microsoft software components; and

(vi) an April 2007 warning letter regarding defendants' unlicensed distribution of Volume License products.

Defendants do not contest that Microsoft sent the above-listed letters; in fact, defendants directly admitted receipt of the January 30, 2007 and April 2007 letters. Defendants did, however, state that they did not remember receipt of the June 3, 2005 letter.

Subsequent to its investigation, Microsoft filed the instant suit on May 5, 2008, containing six claims against defendants. Specifically, plaintiff alleged it was entitled to monetary and injunctive relief, as well as an order impounding any illicit or counterfeit materials, on the basis of defendants' infringing, unlicensed, and counterfeit distributions of Microsoft products. Plaintiff sought partial summary judgment[2] as to liability on all six claims, and the matter was subsequently fully briefed and argued prior to disposition. For the reasons stated from the Bench and elucidated below, plaintiff was awarded partial summary judgment as to defendants' liability on Claims I, II, III, V, and VI, and further briefing was ordered with respect to defendants' liability on Claim IV.

## II

### A. Claim I: Copyright Infringement

In order to show defendants' liability on Claim I for copyright infringement, Microsoft must show (i) that it owns valid copyrights in the works at issue, and (ii) that defendants encroached upon Microsoft's exclusive rights in those products. *See* 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an

---

[2] The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

infringer of the copyright . . . ."); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991), *cited in CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004); *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 353 (4th Cir. 2001); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994). At issue in Claim I is Microsoft's exclusive right of distribution. *See* 17 U.S.C. 106(3) (exclusive right to authorize distribution of copies by public sale or other transfer of ownership). And importantly, it is well-settled that a plaintiff need not show knowledge, intent, or any other sort of mental state by a defendant in the chain of distribution of an infringing work. *See Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 198–99 (1931); *CoStar Group*, 373 F.3d at 549 (observing that § 501 "does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights"); *see also Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1113 (2d Cir. 1986) ("Even an innocent infringer is liable for infringement."); *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1083 (D. Md. 1995) ("[N]either lack of knowledge nor intent are defenses to a claim of copyright infringement").[3]

Here, the undisputed record reflects defendants' unauthorized distribution of Student Media, Fresh Start, and Volume License Media software, as well as defendants' involvement in the sale of a counterfeit version of Microsoft Server 2003, all of which violated Microsoft's exclusive rights of distribution in those products. The record further reflects that Microsoft owns valid copyrights in all of the products at issue, and that defendants distributed—or, in the case of Microsoft Server 2003,

---

[3] As correctly observed by Microsoft, questions of intent or knowledge may be relevant to damages—specifically, whether enhancement of statutory damages or award of attorneys fees is appropriate. *See* 17 U.S.C. § 504(c)(2); *see also Grey Computer*, 910 F. Supp at 1083 ("Rather, knowledge and intent are factors for [a] [c]ourt to consider in determining whether to award statutory damages and attorneys fees."). Because the instant ruling reaches only the question of liability, however, defendants' claims as to lack of knowledge or intent are irrelevant here.

arranged the distribution of—those programs without proper licensing agreements from Microsoft. Indeed, defendants' only contention is that they lacked knowledge that the products, which they claim were obtained from third-party suppliers, were not licensed for distribution. But because lack of knowledge or intent is not a defense to liability for copyright infringement pursuant to § 501(a), Microsoft is entitled to partial summary judgment as to the question of liability against both defendants[4] on Claim I.

### B.   Claim II: Distribution of Illegally-Imported Copyrighted Works

With respect to Claim II, Microsoft must show (i) its valid copyright in the works at issue, (ii) importation into the United States of copies of those copyrighted works without Microsoft's authority, and (iii) defendants' distribution of those illegally-imported items. *See* 17 U.S.C. § 602(a) ("Importation into the United States, without the authority of the owner of the copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable

---

[4] Teshome is, and was for all times relevant to this suit, the sole owner, officer, and employee of Pronet. In essence, Pronet was Teshome's alter ego. Accordingly, because each unlicensed distribution was thus an action by Teshome on Pronet's behalf, both Teshome and Pronet are jointly and severally liable for the unlawful distributions at issue. As a result, it is unnecessary to address Microsoft's arguments regarding contributory or vicarious liability, as notions of contributory or vicarious liability need only be addressed where the person held to be contributorily or vicariously liable is distinct from the person who engaged in the infringing activity. *See Broadcast Music, Inc. v. Jeep Sales & Serv. Co.*, 747 F. Supp. 1190, 1194 n. 1 (E.D. Va. 1990) (observing that contributory infringement is appropriate where a person, *inter alia*, has knowledge of the "infringing activity *of another*" (quoting *Columbia Pictures Indus. v. Redd Horne*, 749 F.2d 154, 160 (3d Cir. 1984) (emphasis added)); *CoStar Group*, 373 F.3d at 549–50 (observing that, although contributory or vicarious liability may be appropriate in some cases, § 501 only directly describes "the party who *actually engages* in infringing conduct") (emphasis added)). Similarly, defendants' argument that they are not contributorily or vicariously liable for the infringing activity of third parties who sold them the products at issue is misplaced, as defendants are not being held liable for the activity of third parties, but rather for their own activity in distributing infringing work.

under section 501.") In essence, Claim II, like Claim I, is a claim that defendants interfered with Microsoft's exclusive distribution rights. But whereas Claim I alleges interference with those distribution rights because defendants lacked any licensing agreements for the products they distributed, Claim II alleges interference with Microsoft's distribution rights because defendants distributed products that had been illegally imported, as defined by § 602(a). And the undisputed record clearly shows that the products in question—specifically, those four orders of Student Media or Volume License Media products where Microsoft determined the products were licensed for distribution in Ireland, not in the United States—were, in fact, imported in violation of § 602(a). Defendants argue that because they did not themselves import the products, and because they were *unaware* of the illegal importation, they cannot be held liable. Neither knowledge of the illegal importation,[5] nor actual importation by the defendant to the claim, however, are requirements for a claim, as Claim II is here, of unlawful distribution of illegally-imported products. *See Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 482 (9th Cir. 1994) ("[T]he purchaser of illegally imported copies has no more authority to distribute copies than does the original importer."); *O'Well Novelty Co. v. Offenbacher, Inc.*, 49 U.S.P.Q.2d 1576, 1579, 1998 WL 988197 (D. Md. 1998) ("[A]ll parties in the chain of distribution are liable for copyright infringement." (citing *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs.*, 647 F.2d 200, 207 (D.C. Cir. 1981))). Thus, because defendants distributed illegally-imported Student Media and Volume License Media products, Microsoft is entitled to partial summary judgment against both defendants as to liability on Claim II.

C.  **Claim III: Violation of the DMCA**

---

[5] *See supra* note 3.

To establish the violation pled in Claim III, Microsoft must show: (i) ownership of a valid copyright in the work at issue; (ii) that the work at issue is effectively controlled by a technological measure;[6] and (iii) that defendants illegally trafficked in a technology, product, service, device, component, or part that meets one of three criteria—namely, that it either (a) is primarily designed or produced for the purpose of circumventing that technological measure, (b) has limited commercially significant purpose or use other than circumvention of that technological measure, or (c) is marketed by defendants for use in circumventing that technological measure. *See* § 1201(a)(2)(A)–(C). Moreover, to "circumvent a technological measure" is defined, in pertinent part, as "to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." § 1201(a)(3)(A). Here, the record clearly reflects that Microsoft's requirement of a valid Product Key is a technological measure that effectively controls the works at issue, which are protected by valid copyrights. The record also clearly reflects that defendants trafficked in counterfeit and unauthorized Product Keys and Product Key Labels that are necessarily designed for the purpose of circumventing the technological measure by allowing access to the Microsoft products without proper authorization. *See, e.g., Microsoft Corp. v. EEE Business Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) (finding violation of § 1201(a)(2) where defendant distributed Volume License Product Keys without authorization). Accordingly, Microsoft is entitled to partial summary judgment on the question of defendants' liability on Claim III.

**D.    Claim IV: Violation of the ACAA**

---

[6] A technological measure "effectively controls access to a work" where "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." § 1201(a)(3)(B).

In order to prove defendants' liability for violation of the ACAA, Microsoft must demonstrate that defendants knowingly trafficked,[7] in interstate commerce or with respect to a copyrighted computer program,[8] in either (i) a counterfeit[9] or illicit[10] label that is affixed to, enclosing, or accompanying, or designed to be affixed to, enclose, or accompany a copy of a computer program; or (ii) counterfeit documentation or packaging[11] for a copy of a computer program. *See* 18 U.S.C. § 2318(a)(1)(A), (B). Defendants do not contest having trafficked in counterfeit and illicit labels, as well as counterfeit documentation and packaging, with respect to copyrighted Microsoft computer programs. Defendants do argue, however, that they did not *knowingly* do so, and that as a result, summary judgment is inappropriate at this time. During the course of the hearing, Microsoft cited *Microsoft Corp. v. Image & Business Solutions, Inc.*, No.

---

[7] The term "traffic" is defined as "to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or to make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise dispose of." *See* 18 U.S.C. §§ 2318(b)(2), 2320(e)(2).

[8] *See* § 2318(a)(1), (c)(2), (c)(3)(B).

[9] The term "counterfeit label" is defined as "an identifying label or container that appears to be genuine, but is not." § 2318(b)(1).

[10] The term "illicit label" is defined as a "genuine certificate, licensing document, registration card, or similar labeling component" that is used by the copyright owner to verify that a product is not counterfeit or infringing; and is, without the copyright owner's permission, either (i) "distributed or intended for distribution not in connection with the copy ... to which ... [it] was intended to be affixed by the respective copyright owner"; or (ii) "in connection with a genuine certificate or licensing document, knowingly falsified in order to designate a higher number of licensed users or copies than authorized by the copyright owner ... ." § 2318(b)(4).

[11] The term "counterfeit documentation or packaging" is defined as "documentation or packaging that appears to be genuine, but is not." § 2318(b)(6). The phrase "documentation or packaging" is defined, in pertinent part, as "documentation or packaging, in physical form, for a ... copy of a computer program." § 2318(b)(5).

05cv6807, 2007 WL 2874430, at *8 (C.D. Cal. 2007), for the proposition that the knowledge required by § 2318 is knowledge of the facts that constitute a violation of § 2318, and not knowledge of the law. The import of that case on these proceedings is unclear, however, both because neither party discussed its applicability in their pleadings, and also because Microsoft did not enumerate, with specificity, how the undisputed record demonstrates defendants' knowledge with respect to each alleged § 2318 violation. Accordingly, further briefing with respect to liability on Claim IV is required to develop the record.

### E. Claim V: Trademark Infringement

In order to prove that defendants are liable for trademark infringement as alleged in Claim V, Microsoft must show (i) its ownership of a valid, protectable trademark; (ii) defendants' unauthorized use of that trademark in commerce, through reproduction, counterfeit, copy, or colorable imitation of the registered mark; and (iii) a likelihood of confusion as a result of defendants' unauthorized use. *See* 15 U.S.C. § 1114(1)(a); *Petro Shopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997). Here, the record clearly shows that with respect to each sale at issue, defendants used a valid, protectable trademark registered to Microsoft—either "Microsoft," "Windows," or the Microsoft colored-flag logo. Accordingly, because defendants used these trademarks in connection with the sale of unlicensed—and in some cases, counterfeit—products in an attempt to demonstrate the software was genuine and licensed, defendants violated § 1114(1)(a). *See Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of likelihood of confusion."), *cited in Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287

(S.D.N.Y. 2003) ("Indeed, confusing the customer is the whole purpose of creating counterfeit goods."). Accordingly, Microsoft is entitled to partial summary judgment as to defendants' liability on Claim V.

### F.     Claim VI: False Designation of Origin or Approval

Finally, with respect to Claim VI, Microsoft must show, in effect, that defendants (i) used, in commerce and in connection with any services, goods, or container for goods, (ii) any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (iii) is likely to cause confusion, mistake, or deception as to the origin or affiliation of goods or services, or, in the case of commercial advertising, misrepresents the nature, characteristics, qualities, or geographic origin of goods, services, or commercial activities. *See* 15 U.S.C. § 1125(a)(1). Where, as here, the undisputed record shows that "counterfeit software [is] packaged and designed so as to appear to the ordinary consumer to be genuine Microsoft software[,]" but is in fact not so, summary judgment as to false designation of origin is appropriate. *Microsoft Corp. v. Computer Serv. & Repair, Inc.*, 312 F. Supp. 2d 779, 785 (E.D.N.C. 2004). Thus, Microsoft is entitled to summary judgment as to defendants' liability on Claim VI.

Accordingly, for the reasons stated from the Bench and elucidated herein, and for good cause,

It is hereby **ORDERED** that plaintiff's motion for partial summary judgment is **GRANTED IN PART**, insofar as plaintiff is entitled to partial summary judgment with respect to defendants' liability on Claims I, II, III, V, and VI.[12]

---

[12] It is important to observe, of course, that this ruling does not address the appropriate remedy for defendants' liability.

It is further **ORDERED** that plaintiff's motion for summary judgment with respect to Claim IV is **DEFERRED** pending supplemental briefing as follows:

1. plaintiff is **DIRECTED** to file a memorandum further elucidating whether summary judgment is appropriate as to defendants' liability on Claim IV, or in the alternative, moving to withdraw Claim IV in light of the partial summary judgment granted on plaintiff's other claims, by 5:00 p.m., Friday, December 12, 2008; and

2. defendants are **DIRECTED** to file any memoranda in response, if necessary, by 5:00 p.m., Friday, December 19, 2008.

Subsequent to the parties' submission of their pleadings, an Order will issue directing the parties on the appropriate manner in which to proceed.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
December 5, 2008

T. S. Ellis, III
United States District Judge