**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| MICROSOFT CORP., | ) | |
|     Plaintiff, | ) | |
| | ) | |
|        v. | ) | No. 1:08cv434 |
| | ) | |
| PRONET CYBER TECHNOLOGIES, | ) | |
| INC., et al., | ) | |
|     Defendants. | ) | |

**MEMORANDUM OPINION**

At issue in this counterfeiting case is whether plaintiff is entitled to partial summary judgment on defendants' liability pursuant to 18 U.S.C. § 2318, which makes unlawful knowing trafficking in counterfeit labels in connection with a copy of a computer program. Defendants oppose partial summary judgment solely on the ground that they did not know their conduct was unlawful, and hence they did not "knowingly" traffic in counterfeit labels.

For the reasons that follow, plaintiff is entitled to partial summary judgment. Specifically, defendants' argument fails because § 2318 only requires knowledge of the facts that constitute a violation of § 2318, and not knowledge that the conduct is unlawful.

**I**[1]

Plaintiff Microsoft Corp. ("Microsoft"), a Washington corporation, develops, markets, distributes, and licenses computer software throughout the United States and abroad. Defendant Pronet Cyber Technologies, Inc. ("Pronet"), a Delaware corporation with its principal place of business in Alexandria, Virginia, distributes computer software and components on the internet

---

[1] The facts recited here are derived from the record as a whole and are largely undisputed. Where disputes exist, they are noted and their materiality assessed.

through various websites and other means. Defendant Joseph Teshome ("Teshome"), a Virginia resident, is the sole owner, operator, and employee of Pronet. Pronet and Teshome have been in the business of selling and distributing Microsoft products since at least 1999, although Microsoft only brings its claims here on the basis of defendants' distribution of Microsoft products since May 2005.

Microsoft's software products, which are typically sold on CD-ROMs and other forms of computer media, are distributed along with a number of proprietary materials and security features. Those include, *inter alia*: (i) Product Keys, which are 25-character alphanumeric codes, unique to each licensee to whom a product is distributed, that must be entered by a user in order for the Microsoft program to operate properly; and (ii) COAs (Certificates of Authenticity), which are certificates or labeling components that contain difficult-to-reproduce security features and which help users identify genuine Microsoft products. In many cases—most often, in sales to individuals for personal use—the Product Key for a particular copy of a program is located on the unique COA label accompanying that copy. In other cases—most often, in sales to organizations pursuant to volume licensing agreements with Microsoft—the Product Key for a particular copy of a program is located on a Product Key label affixed to the program's packaging. Whereas Product Keys given to individual purchasers are generally only intended for one-time use on that purchaser's individual computer, the Product Keys given to volume purchasers are often intended for recurring use on an agreed-upon number of computers in that purchasing organization's control. By maintaining an internal list that matches each copy of a particular program to that copy's unique Product Key, Microsoft is able to determine whether a given user has the appropriate license for the product in that user's possession.

Misused Product Keys typically fall into two categories: (i) "unauthorized" Product Keys,

where a user has obtained an otherwise valid Product Key not meant for that particular product; and (ii) "counterfeit" Product Keys, where a Product Key is created by someone other than Microsoft, but nonetheless succeeds in permitting use of the program. In this respect, Microsoft's Product Key system is essentially equivalent to a building security system where specified users have identification cards that permit them to enter the building.

In such a building security sysem, the equivalent of an "unauthorized" Product Key would be a valid identification card obtained and used by someone other than the person to whom that card was assigned; the equivalent of a "counterfeit" Product Key would be an identification card created by someone other than the valid operator of the building security system, but which nonetheless succeeds in allowing access to the building.

In February and March 2008, defendants sold a number of validly-copyrighted Microsoft Windows XP Professional program copies to Microsoft investigators posing as ordinary consumers. Based on a comparison to its own internal tracking system, Microsoft determined that a number of the Windows XP Professional copies sold by defendants were accompanied by unauthorized or counterfeit Product Keys, many of which were printed on non-Microsoft labels. Specifically, defendants' sales included, *inter alia*:

(i) the February 20, 2008 sale of one unit of Windows XP Professional, accompanied by an unauthorized Product Key printed on a non-Microsoft label;

(ii) the February 29, 2008 sale of three units of Windows XP Professional, two of which contained unauthorized Product Keys, and one of which contained an invalid Product Key, with all three Product Keys printed on non-Microsoft labels; and

(iii) the March 2008 sale of five units of Windows XP Professional, all containing counterfeit Product Keys printed on non-Microsoft labels.

-3-

Additionally, the record reflects that in April 2008 defendants received an order from Microsoft's investigators, again posing as ordinary consumers, for a validly-copyrighted program called Windows Server 2003. The record further reflects that the unit sold to Microsoft's investigators in this instance contained an unauthorized Product Key printed on a non-Microsoft label. Although defendants argue that they did not fulfill the Windows Server 2003 order from their own supply, instead arranging for the order to be "drop-shipped" by a third party, defendants do not contest having arranged the order. The record does not reflect who—whether defendants or the third-party supplier—created the non-Microsoft label that accompanied the Windows Server 2003 order.

Defendants aver that they did not know any Product Keys printed on labels affixed to the products they sent were counterfeit or unauthorized. Yet, Teshome testified[2] that he *did* know that many of the *labels* affixed to these products were not genuine Microsoft labels. Specifically, Teshome testified that he created his own labels and then affixed them to Microsoft products that defendants sold. Teshome testified that he typically did so *either* (i) where his suppliers sent him a product containing a damaged label,[3] or (ii) where his suppliers sent him a product that did not contain any label at all. To make the labels he created functional, he placed Product Keys from genuine Microsoft COA labels on the labels he created. In this respect, Teshome testified that he obtained Product Keys either from the damaged labels, or from copies of COA labels. Teshome testified that he these copies of COA labels because his suppliers periodically included such copies

---

[2] The record reflects that Microsoft deposed Teshome, and the relevant excerpts from that deposition testimony are contained within the record.

[3] The fact that Teshome testified that he *believed* the damaged labels were genuinely affixed to their intended products does not affect Teshome's admission that he knew the labels *he created* were not genuine Microsoft labels.

with shipments of Microsoft products. Specifically, Teshome claimed that with respect to some shipments, his suppliers would send a single sheet of paper depicting black-and-white copies of "stand-alone" COA labels for the products in that particular shipment.[4] Teshome testified that when he used Product Keys from these copies of "stand-alone" labels for the labels he created on his own, he sometimes attempted to "match" the Product Keys from a copied label with a product from which he had just removed a damaged label. Importantly, however, Teshome also testified that in other cases, he simply re-used Product Keys from the copies of stand-alone labels multiple times. In this respect, Teshome admitted that in at least some cases, he knowingly used Product Keys from the copied COA labels without even attempting to match them to what he believed to be their intended products.[5]

---

[4] It is worth noting Microsoft's contention that these copies of sheets of COA labels could not have been legally created in the manner depicted on the copies in Teshome's possession because arranging the labels on a sheet of paper as they are depicted would have required illegally removing them from the products to which they were originally affixed. Teshome nevertheless testified—and Microsoft has not presented evidence disputing—that he did not know how the copies were created, but merely received them from his suppliers in copied form.

It is also worth noting that with respect to some shipments, the number of copied labels on these single sheets of paper was greater—and in other cases, lesser—than the number of products sent. The record does not reflect, however, the cause for these discrepancies—in other words, the record does not reflect whether, as Teshome claimed, he did not know why the number of copied labels did not match the number of products he received. Because the record is not clear, it is appropriate to adopt Teshome's explanation for purposes of the instant summary judgment motion. In any event, insofar as questions with respect to liability or damages on which Microsoft has not already received judgment may arise at trial, this evidence of a discrepancy between the number of labels on the copied sheets and the number of products in a shipment is certainly relevant evidence as to Teshome's state of mind; it shows, at a minimum, that some of the copied labels were not intended by Microsoft to be affixed to the products Teshome received from his suppliers.

[5] A December 5, 2008 Order granting Microsoft partial summary judgment notes that "Teshome testified that he received the sheets of Product Key labels, either as copies or originals, from his suppliers, and that he only used them as a means of trying to 'match' products with damaged Product Key labels with their appropriate Product Keys." *Microsoft Corp. v. Pronet*

In addition to using investigators posing as customers to purchase products from defendants, Microsoft also sent defendants a number of letters warning them about potentially-unlawful activity, including, *inter alia*, a January 2005 letter notifying defendant that a newly-passed law—the Anti-Counterfeiting Amendments Act of 2004, which amended § 2318—made it unlawful to traffic knowingly in illicit COA labels, including "stand-alone" sheets of genuine labels not affixed to their intended products. Although defendants do not contest that the January 2005 letter was delivered to defendants' mailbox drop, Teshome testified that he did not recall receiving or reading the letter.

Microsoft filed suit against defendants on May 5, 2008, seeking monetary and injunctive relief on the basis of defendants' infringing, unlicensed, and counterfeit distributions of Microsoft products. Microsoft subsequently filed an amended complaint on June 5, 2008, setting forth additional factual allegations and correcting several clerical errors. The amended complaint sets forth claims for the following:

> (i) copyright infringement, in violation of 17 U.S.C. §§ 106(3) and 501(a) ("Claim I");
>
> (ii) infringement by distribution of illegally-imported copyrighted works, in violation of 17 U.S.C. §§ 106, 501, and 602(a) ("Claim II");

---

*Cyber Techs., Inc.*, No. 1:08cv682, at 6 (E.D. Va. Dec. 5, 2008) (Order). Further review of Teshome's deposition testimony discloses that he only testified that he received *copies* of stand-alone sheets of labels, and not stand-alone sheets of genuine Microsoft COA labels that he could then affix directly to products.

The December 8 Order, in elucidating the basis for ordering supplemental briefing on the § 2318 knowledge requirement, also observed that "[d]efendants do not contest having trafficked in counterfeit and illicit labels, as well as counterfeit documentation and packaging, with respect to copyrighted Microsoft computer programs." *Id.* at 12. Again, upon further review of Teshome's deposition testimony and upon consideration of the parties' supplemental briefing, it is clear that while defendants do not contest having trafficked in "counterfeit" labels, defendants *do* contest having trafficked in "illicit" labels.

Neither of these observations in the December 8 Order were material to the result reached therein; accordingly, their clarification here does not affect the result reached in that Order.

(iii) illegal trafficking in counterfeit and unauthorized Product Keys, in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.* ("Claim III");

(iv) illegal trafficking in counterfeit or illicit labels, in violation of 18 U.S.C. § 2318 ("Claim IV");

(v) trademark infringement, in violation of 15 U.S.C. § 1114(1) ("Claim V"); and

(vi) false designation of origin, in violation of 15 U.S.C. § 1125(a)(1) ("Claim VI").

Microsoft sought partial summary judgment on defendants' liability on all six claims, and it received partial summary judgment on defendants' liability with respect to Claims I, II, III, V, and VI. *See Microsoft Corp. v. Pronet Cyber Techs., Inc.*, No. 1:08cv682 (E.D. Va. Dec. 5, 2008) (Order).[6] The parties were ordered to submit supplemental briefing to elucidate further whether Microsoft is entitled to summary judgment with respect to Claim IV. Specifically, the parties were directed to address whether § 2318 requires proof that defendants knew their conduct was unlawful. The parties complied, submitting the required supplemental briefing, and accordingly, the matter is now ripe for disposition.

## II

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

---

[6] That Order contains further elucidation of the facts relevant to those claims on which Microsoft has already been granted partial summary judgment, including description of several infringing, unlicensed, and unlawful acts that are unnecessary to repeat here. *See id.* at 2–7.

**III**

To prove defendants' liability under § 2318, Microsoft must demonstrate that defendants

knowingly trafficked,[7] in interstate commerce,[8] in either a "counterfeit" or an "illicit" label affixed

to, enclosing, or accompanying, or designed to be affixed to, enclose, or accompany a copy of a

computer program. *See* § 2318(a)(1)(A). On the one hand, a "counterfeit" label is "an identifying

label . . . that appears to be genuine, but is not." § 2318(b)(1). An "illicit label," on the other hand,

is a "genuine certificate, licensing document, registration card, or similar labeling component" that

is used by a copyright owner to verify that a product is not counterfeit or infringing, and is, without

the copyright owner's permission, either (i) "distributed or intended for distribution not in

connection with the copy . . . to which . . . [it] was intended to be affixed by the respective copyright

owner"; or (ii) "in connection with a genuine certificate or licensing document, knowingly falsified

in order to designate a higher number of licensed users or copies than authorized by the copyright

owner . . . ." § 2318(b)(4). Thus, because Microsoft alleges that Teshome knowingly trafficked in

*both* "counterfeit" *and* "illicit" labels, it is necessary to address Microsoft's proof with respect to

each type of label in turn. For the reasons that follow, Microsoft is entitled to partial summary

judgment with respect to defendants' liability for knowingly trafficking in "counterfeit" labels, but

the record is insufficiently clear to award Microsoft partial summary judgment as to defendants'

liability for knowingly trafficking in "illicit" labels.

---

[7] The term "traffic" is defined as "to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or to make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise dispose of." *See* 18 U.S.C. §§ 2318(b)(2), 2320(e)(2).

[8] *See* § 2318(a)(1), (c)(2); *see also* § 2318(c)(3)(B) (also providing for jurisdiction where the counterfeit label is affixed to or accompanies a copyrighted computer program).

A.    **Defendants Knowingly Trafficked in Counterfeit Labels**

First, with respect to Microsoft's claim that defendants knowingly trafficked in "counterfeit" labels, it is undisputed that Teshome knowingly made his own labels and included what he believed were Microsoft Product Keys on those labels. Thus, it is undisputed that he knowingly made "counterfeit" labels because the labels he created "appear[ed] to be genuine, but [were] not." § 2318(b)(1). The labels appeared to be genuine because a Product Key was written, typed, or otherwise placed on them; they were not genuine, however, because Teshome, not Microsoft, created them. *See United States v. Teh*, 535 F.3d 511, 520 (6th Cir. 2008) (affirming findings by district court, sitting as the trier of fact in a § 2318 criminal case, that DVD labels that "appeared to be 'home made[,]' were of poor quality, contained misspellings[,] and were not centered" appeared to be genuine, but were not, and were thus counterfeit labels (first alteration in original)). Moreover, Teshome knew the labels appeared to be genuine, but were not; indeed, he testified that he created them specifically because he believed that purchasers expected Microsoft products to come with labels containing Product Keys. Finally, it is undisputed that after knowingly creating counterfeit labels, Teshome affixed those labels to copies of what he believed to be Microsoft programs and then sold those counterfeit-labeled copies to Microsoft's investigators. Accordingly, it is undisputed that defendants knowingly trafficked in counterfeit labels in violation of § 2318, and Microsoft is thus entitled to partial summary judgment as to liability against both defendants[9] on Claim IV with

---

[9] Teshome is, and was for all times relevant to this suit, the sole owner, officer, and employee of Pronet. In essence, Pronet was Teshome's alter ego. Accordingly, because each sale was thus an action by Teshome on Pronet's behalf, both Teshome and Pronet are jointly and severally liable for the violations of § 2318 at issue. *See Microsoft Corp. v. Image & Bus. Solutions, Inc.*, No. 05cv6807, 2007 WL 2874430, at *2, 8 (C.D. Cal. May 4, 2007) (unpublished) (awarding joint and several liability against defendant corporation and its "sole owner and officer" for § 2318 violations and copyright infringement). *Cf. Nelson-Salabes, Inc. v.*

respect to each label containing a Product Key that was created by Teshome and then affixed to or otherwise distributed with a Microsoft product.

Defendants seek to avoid this result by arguing that they did not *knowingly* traffic in counterfeit labels because Teshome did not know he was violating § 2318 when he made his own labels, included Product Keys on those labels, and then affixed those labels to Microsoft products before selling the products to his purchasers. Teshome's deposition testimony in this respect came in two forms. On the one hand, he claimed that when he created a label to replace a damaged label, he believed he was simply "matching" unlabeled products with their intended Product Keys. On the other hand, with respect to situations where he re-used a Product Key more than once or created labels for products that never had an genuine Microsoft label, Teshome broadly claimed that he did not know his actions were unlawful. In any event, with respect to all of the labels that Teshome created, defendant's sole argument is that they should not be held liable under § 2318 because Teshome did not know his actions were unlawful.

Defendants' argument misapprehends § 2318's "knowingly" requirement. Importantly, it is well-settled that "unless the text of a statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998), *quoted in United States v. Mitchell*, 209 F.3d 319, 322 (4th Cir. 2000) (use of "knowingly" in 18 U.S.C. § 924(a)(2) requires factual, not legal, knowledge), *United States v.*

*Morningside Dev., LLC*, 284 F.3d 505, 517–518 (4th Cir. 2002) (observing general rule that "all defendants who engage in the same act of copyright infringement are jointly and severally liable" for damages, and further observing that defendants who act as "practical partners" in infringement are also generally held jointly and severally liable for lost profits); *Broad. Music, Inc. v. Jeep Sales & Serv. Co.*, 747 F. Supp. 1190, 1194 n. 1 (E.D. Va. 1990) (observing that liability of officer or director of corporation in copyright infringement is generally joint and several with corporate defendant).

*Gilbert*, 430 F.3d 215, 219 (4th Cir. 2005) (same), *and United States v. Fuller*, 162 F.3d 256, 260

(4th Cir. 1998) (same for 21 U.S.C. § 841(a)). Thus, while a § 2318 claim requires Microsoft to

show Teshome knew he trafficked in a label that appeared to be genuine but was not, § 2318 does

*not* require Microsoft to show Teshome knew doing so was unlawful. This is sensible, of course, as

it comports with the plain language Congress used; notably, Congress chose *not* to include the term

"willfully," which has generally been interpreted to require knowledge that conduct is unlawful.[10]

Indeed, Congress amended a previous version of § 2318 in 1982, removing the statute's then-existing

"fraudulent intent" requirement and replacing it with the current "knowingly" requirement. *See* S.

691, 97th Cong., 96 Stat. 91 (1982).[11] Moreover, § 2318's legislative history suggests that Congress

---

[10] *See, e.g., Bryan*, 524 U.S. at 193 (holding that use of term "willfully," as opposed to "knowingly," requires proof of knowledge that conduct is unlawful). It is also worth noting that various statutes using the word "knowingly" have also been interpreted to require proof of what could be characterized as legal knowledge, but consistent with the Supreme Court's explanation in *Bryan*, those have been cases where "the text of [the] statute dictates a different result . . . ." *Id.* For example, in *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court found a statute prohibiting, *inter alia*, "knowing[] use[]" of food stamps "in any matter not authorized by this chapter" to require proof of knowledge that the food stamp use or possession "was unauthorized or illegal." *Id.* at 420 n. 1, 428–34. In *Liparota*, however—unlike here—the statute specifically included the phrase "not authorized by this chapter"; moreover, the Supreme Court rested its holding on the fact that a contrary interpretation would "criminalize a broad range of apparently innocent conduct." *Id.* at 426. Notably, § 2318 neither includes language that could be read to require any sort of legal knowledge, nor does reading § 2318 consistent with the result reached here pose the risk of criminalizing innocent conduct. Importantly, where, as here, a person knows that he creates a label that appears to be genuine, but is not, his conduct is not innocent; rather, it is necessarily deceptive and misleading.

[11] It is worth noting that although Congress has amended § 2318 several times, both the "knowingly" requirement and the definition of a "counterfeit label"—one that "appears to be genuine, but is not"—have remained unchanged since 1982. *See, e.g.* S. 691, 97th Cong., 96 Stat. 91 (1982) (replacing "fraudulent intent" requirement with "knowingly" requirement); S. 1136, 104th Cong., 110 Stat. 1386 (1996) (adding, *inter alia*, computer programs to § 2318's grasp); H.R. 3632, 108th Cong., 118 Stat. 3912 (2004) (adding, *inter alia*, civil enforcement provisions and prohibition of trafficking in "illicit labels").

was well aware that the amended statute only required proof of knowledge that labels were counterfeit—namely, that the labels appeared to be genuine, but were not. *See* S. Rep. 97-274, at 8–9 (1981), *as reprinted in* 1982 U.S.C.C.A.N. 127, 134–35 (noting the House Judiciary Committee's "view that the fraudulent intent requirement is superfluous if one is acting with the knowledge that the [labels] are counterfeit" because "it would be difficult to conceive of a situation in which one could traffic in [labels] knowing that they are counterfeit without intending to defraud the purchaser").

Although there is but scant case law interpreting § 2318's "knowingly" requirement, what does exist further supports the result reached here. For example, in *Microsoft Corp. v. Image & Business Solutions, Inc.*, No. 05cv6807, 2007 WL 2874430 (C.D. Cal. May 4, 2007) (unpublished), a district court rejected the same argument defendants advance here, namely that § 2318 requires a jury trial where a defendant claims he did not know that his conduct was unlawful. *Id.* at *8. In doing so, the court in *Image & Business Solutions* held that § 2318 only requires proof that a defendant is "aware of the facts that constitute the offense." *Id.* (citing *Bryan*, 524 U.S. at 192–93).

Defendants respond by pointing to *Microsoft Corp. v. Ion Technologies Corp.*, 484 F. Supp. 2d 955 (D. Minn. 2007), where the court found the plaintiff to have met its burden on the knowledge requirement through proof "that [defendant] knew of [§ 2318] on [its] effective date . . . ." *Id.* at 961. This case, defendants argue, stands for the proposition that § 2318 liability requires proof that a defendant knew his conduct was unlawful. Yet, defendants misapprehend the import of *Ion Technologies*. In that case, the court did not hold that a § 2318 claim *requires* proof that a defendant is aware of § 2318, nor did that court *require* proof that a defendant know his conduct was unlawful. Instead, *Ion Technologies* merely stands for the unremarkable proposition that such proof is *sufficient*

-12-

to show the requisite knowledge; it does not stand for the proposition that such proof is *necessary*.[12]

It is also worth noting that the result reached here is consistent with case law interpreting a similar statutory provision—namely, 18 U.S.C. § 2320, from which § 2318(b)(2) explicitly borrows its definition of the term "traffic."[13] This is instructive, as Congress's decision to borrow § 2320's definition of "traffic" in § 2318 suggests that Congress viewed the statutes—and their knowledge requirements—similarly. *See Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1483 (4th Cir. 1996) (observing general rule "that courts should interpret similar language in related statutes alike" (citing 2B Norman J. Singer, *Sutherland Statutory Construction* § 53.03 (5th ed. 1992) (emphasis omitted))); *accord* 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction*

---

[12] *See also Microsoft Corp. v. AGA Solutions, Inc.*, 05cv5796, 2008 WL 5054694, at *7 (E.D.N.Y. Nov. 21, 2008) (declining to find knowledge element of § 2318 satisfied on summary judgment where only proof adduced by plaintiff was "one *accusation* [by a customer] of [defendants] selling tampered and counterfeit software" (emphasis added)). Importantly, *AGA Solutions* is readily distinguishable from this case, as Teshome clearly admitted his knowledge with respect to the counterfeit element.

[13] *See* 18 U.S.C. § 2320(a)(1) (making it unlawful to "knowingly use[] a counterfeit mark" in connection with trafficking in certain goods and services, including, *inter alia*, "labels, patches, [and] stickers"); *United States v. Brooks*, 111 F.3d 365, 372 (4th Cir. 1997) (explicitly rejecting argument that use of "knowingly" in § 2320(a)(1) requires proof of "actual deception or intent to mislead," instead affirming sufficiency of evidence where government proved "that the defendant knowingly used a counterfeit mark" as "counterfeit mark" is defined in § 2320(d)(1)(A)); *see also United States v. Habegger*, 370 F.3d 441, 444 (4th Cir. 2004) ("knowingly," as used in § 2320(a)(1), requires proof that defendant "knew the mark was counterfeit"); *United States v. Gantos*, 817 F.2d 41, 43 (8th Cir. 1987) (affirming district court's rejection of defense-proposed jury instruction that § 2320(a)(1) required proof of defendant's knowledge that conduct in question violated the law (citing S. Rep. 98-526, at 11 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 37448, 3637 (observing that § 2320(a) requires proof that a defendant " 'knows' that the goods or services are counterfeit"))); *United States v. Baker*, 807 F.2d 427, 428–30 (5th Cir. 1986) ("Both the language of [§ 2320] and the legislative history lead to the inescapable conclusion that [defendant] need not have known his conduct was a crime." (citing S. Rep. 98-526, at 11)).

§ 53:3 (7th ed. 2008).

In sum, the knowledge requirements in § 2318 and § 2320 do not require proof that a defendant knew his conduct was unlawful. Indeed, with respect to § 2320's analogous knowledge requirement, the Fifth Circuit pithily put this point as follows:

> It is not surprising that Congress would allow conviction of one who knows that he is selling bogus "Rolex" watches even though he does not know his conduct is punishable as a crime. While it is true that "the general principle that ignorance or mistake of law is no excuse is usually greatly overstated" (American Law Institute, Model Penal Code § 2.02 comment 131 (Tent. Draft no. 4 1955)), the principle continues to be valid to the extent that ordinarily "the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy." *United States v. Freed*, 401 U.S. 601, 612 (1971) (Brennan, J., concurring). [Defendant]'s claim is merely that, even though he had the mental states required by the face of the statute, he should not be convicted because he did not know that Congress had passed a statute criminalizing his conduct. This clearly is not the law. A defendant cannot "avoid prosecution by simply claiming that he had not brushed up on the law." *Hamling v. United States*, 418 U.S. 87, 123 (1974).

*United States v. Baker*, 807 F.2d 427, 429 (5th Cir. 1986) (footnote omitted).

Accordingly, because the undisputed record clearly shows that Teshome knowingly trafficked in labels that he knew appeared to be genuine, but were not, Microsoft is entitled to partial summary judgment as to defendants' liability with respect to each label created by Teshome.

**B.    The Current Record Does Not Show Knowing Trafficking in Illicit Labels**

While the current record clearly establishes that defendants knowingly trafficked in "counterfeit" labels, Microsoft has yet to adduce undisputed evidence that Teshome knowingly trafficked in "illicit" labels.[14] Importantly, Congress specifically limited the definition of an "illicit"

---

[14] It is worth noting as a threshold matter that Microsoft's amended complaint does not specifically allege that defendants knowingly trafficked in "illicit" labels; rather, it alleges that defendants knowingly trafficked in "counterfeit" labels. *See* Am. Compl. ¶¶ 55–61. Yet, because both parties addressed whether defendants knowingly trafficked in illicit labels in their briefing, that issue is addressed here.

label in several respects relevant here.[15] First, a label is only "illicit" if it is *genuine.*"§ 2318(b)(4)

(emphasis added). Second, that *genuine* label is only "illicit" if it is *also* misused in one of two ways;

specifically, it must be either (i) distributed or intended for distribution apart from the copy for which

it was intended, or it must be (ii) knowingly falsified in order to designate a higher number of users

_____

[15] Section 2318(b)(4), which supplies the full definition for an "illicit" label, provides as follows:

> (4) the term "illicit label" means a genuine certificate, licensing document, registration card, or similar labeling component—

>> (A) that is used by the copyright owner to verify that a phonorecord, a copy of a computer program, a copy of a motion picture or other audiovisual work, a copy of a literary work, a copy of a pictorial, graphic, or sculptural work, a work of visual art, or documentation or packaging is not counterfeit or infringing of any copyright; and

>> (B) that is, without the authorization of the copyright owner—

>>> (i) distributed or intended for distribution not in connection with the copy, phonorecord, or work of visual art to which such labeling component was intended to be affixed by the respective copyright owner; or

>>> (ii) in connection with a genuine certificate or licensing document, knowingly falsified in order to designate a higher number of licensed users or copies than authorized by the copyright owner, unless that certificate or document is used by the copyright owner solely for the purpose of monitoring or tracking the copyright owner's distribution channel and not for the purpose of verifying that a copy or phonorecord is noninfringing[.]

§ 2318(b)(4). Importantly, it is undisputed (i) that a Microsoft COA label is a genuine certificate, licensing document, registration card, or similar labeling component; (ii) that COA labels are used by Microsoft to verify that copies of its validily-copyrighted programs are not counterfeit or infringing; (iii) that COA labels are only intended to be affixed by Microsoft to their intended products for one-time use or as otherwise provided in a licensing agreement; and (iv) that a COA or other Microsoft label that designates a particular number of users, if altered to increase the number of licensed users or copies, would fall the scope of § 2318(b)(4)(B)(ii).

or copies than authorized. *See* § 2318(b)(4)(B)(i), (ii).

Although the record clearly reflects that Teshome trafficked in genuine labels—specifically, those that he testified were affixed to the Microsoft products he received from his suppliers—it is not clear that he trafficked in those labels in either of the two methods barred by § 2318(b)(4)(B). Specifically, Teshome claimed the genuine labels he obtained, even though damaged, were distributed *in connection with the copies to which they were intended to be affixed* by Microsoft, and Microsoft has yet to adduce contrary evidence. Moreover, the undisputed record also does not show that Teshome "knowingly falsified" any genuine labels in order to designate a higher number of licensed users or copies than Microsoft authorized. It is true, as Microsoft argues, that Teshome admitted he knowingly used Product Keys from Microsoft COA labels more than once, but it is also true that the record reflects he did so by *creating "counterfeit"* labels, and not by *falsifying genuine* ones.[16] And finally, insofar as Microsoft has argued that Teshome violated § 2318 because he obtained *copies* of genuine labels—specifically, the copies of so-called "stand-alone" sheets of labels—Microsoft has overlooked the plain language of § 2318, which clearly does *not* bar the possession of a *copy* of a genuine label. This is sensible, as the copies of "stand-alone" labels that Teshome possessed would likely be usable in only two ways: (i) to create "counterfeit" labels—ones that appear to be genuine, but are not; or (ii) to obtain the *information* on those labels and use that information in some improper manner other than label creation—in which case the unlawful act is

---

[16] It is worth noting that the legislative history for § 2318(b)(4)(B)(ii) suggests that Congress intended the "knowingly falsified" method of trafficking in illicit labels to apply where, unlike here, a defendant "add[s] a '0' to a '10-user' license authentication label in an attempt to make the label appear to be for a '100-user' license." H.R. Rep. 108-600, at 6 (2004), *available at* 2004 WL 1578020.

-16-

improper *use of that information*, not unlawful trafficking in "illicit" labels.[17]

In sum, Microsoft is entitled to partial summary judgment on defendants' liability as to Claim IV insofar as defendants knowingly trafficked in "counterfeit" labels in violation of § 2318, but Microsoft is not entitled to partial summary judgment on defendants' liability with respect to Microsoft's contention that defendants knowingly trafficked in "illicit" labels in violation of § 2318.[18]

An appropriate Order will issue.

Alexandria, Virginia
January 9, 2009

T. S. Ellis, III
United States District Judge

---

[17] In this respect, it is important to note that Microsoft has already received partial summary judgment on defendants' liability for illegally trafficking in the information on the labels—namely, counterfeit and unauthorized "Product Keys"—in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq. See Microsoft Corp. v. Pronet Cyber Techs., Inc.*, No. 1:08cv682, at 11 (E.D. Va. Dec. 5, 2008) (Order) (granting partial summary judgment on Claim III).

[18] It is important to observe, of course, that this ruling does not address the appropriate remedy for defendants' liability, nor does it preclude Microsoft from adducing evidence at trial showing that defendants knowingly trafficked in illicit labels.